Good morning. May it please the court, Elisa Miller on behalf of the appellant respondent, Jeremias Frito-Miranda. We are here today to decide which country will determine custody, whether that country is Mexico or the United States. More specifically, we're here to determine whether under Article 12 of the Hague Convention on the Civil Aspects of International Child Abduction, whether a 12-year-old child, I'm sorry, an 11-year-old child who's been in the United States has attended elementary school at the same school in Huntington Beach, or in the district court's words, she's achieved academic and interpersonal success at every level, where she has a stepdad here that she refers to as her dad, a little brother who's a United States citizen, Brian. She's developed close relationships with friends and family, whether that child's custody needs to be determined in Mexico. And where there's evidence that uprooting her from this environment will cause her harm, she'll be disrupted from her education, she'll be separated from her family members, including her brother, and she'll be forced to undergo proceedings in a foreign land. Under Article 12 of the Hague Convention, if petitioner commences proceedings within one year of a wrongful retention, the child should be ordered back to the home country. But if proceedings are commenced after a year, as they were here, and it's shown that the child is now settled in the new environment, the court need not order her return. The district court erred in concluding that Brianna is not settled in the United States. Applying Judge Carney's own findings of facts, under every factor traditionally considered by district courts, Brianna is settled in the United States. Those factors are the age of the child, the stability of the child's home, whether the child attends school regularly, whether she participates in activities, whether the parent's employment is stable, whether the child has friends or relatives in the area. Analyzing these factors, the court found here there is, quote, no dispute that Brianna has developed significant connections to the United States. He found that she's attended the same school, she's lived in the same home, that she has close relationships with her stepdad, her mother, her brother, her friends, and her family, and that she participates in extracurricular activities. When he interviewed her in chambers, he described her as intelligent and poised. The district court should have ended its inquiry here, but it went on and said that Brianna cannot be settled in the United States because she is an undocumented immigrant. He decided that this single fact trumped every single factor and precluded her from being settled in the United States. Judge Reinhart wrote in his -- not pertinent at all, or not solely pertinent? It's not solely pertinent. We can see that it might be considered as one of several factors, of seven or eight factors, and it should not be considered particularly important in Brianna's case specifically, whereas in other cases, undocumented status might take on more significance. For example, courts that have considered immigration status often consider it in the context where the child's only been in the United States for one or two years, perhaps, and has moved from residence to residence, changed schools two or three times, indicating that the undocumented status is having some sort of effect on their ability to be settled. In Brianna's case, there was no showing that her undocumented status has any effect on her day-to-day life. She's able to attend school. She's living in the same home. It's more of a ---- There's a possibility that she could be removed on very short notice at any time. That is a possibility. First, there was no indication or any evidence introduced that there has ever been any threats of deportation. Second, as we demonstrated in our brief, the immigration laws of this country don't particularly target law-abiding immigrants or children. And this question was actually squarely addressed in the Supreme Court case called Plyer v. Doe, where the state of Texas sought to deny immigrants education. And the court said But there are certain other benefits that she could not have by reason of being an alien. Is that right? That's true. What the district court pointed to, though, were all future-oriented benefits, things that will happen down the line, like a driver's license or financial aid. With the statute, if you look at the Article XII exception, it says that the statute instructs courts to determine whether the child is now settled in the United States, because for purposes of deciding where custody happens, it's important to look at the current state of the facts. And the district court didn't make any findings of fact as to any disruptive effect her immigration status has on her now. Some mention in the record that the mother is applying for some sort of legal status. Do we know anything more about that? Right. Her grandmother we call her grandmother Brito in the briefs. The Respondent's mother testified that she is a U.S. citizen, and she has been submitting papers for Ms. Brito to be able to remain in the United States. There was no evidence in the record beyond that as to the status of those. We also know her brother is a U.S. citizen, and the Petitioner's mother, who now resides mostly in the United States, is also a U.S. citizen. So there are those connections there and available, so that the status could change, you know, just as possible as a deportation, which is not likely. Status could also change. These are all hypothetical speculations on both ends, which is why immigration isn't a proper determinative factor when the Hague Convention instructs courts to look at whether or not the child is now settled. And we've Right. But the whole well-settled thing only arises in an instance in which otherwise the habitual residence would be somewhere else, essentially, and in which there's a – I don't know whether it's conceded in this case, but essentially it is if the child was wrongfully retained in the United States. I mean, are those two things sort of given at this point? Well, we're not – yes. Article 12 only applies if there is already shown that there the child was at one time wrongfully – All right. But is that literally conceded in this case at this point? It's not on – we're not appealing the court's decision that she was wrongfully – All right. Okay. So it is. So it's settled. That's settled. And it's settled that the habitual residence would have been in Mexico originally. Right. Because you wouldn't have been able to show wrongful retention away from Mexico otherwise. So obviously we have this problem that, you know, the Hague Convention is very sensitive to what kind of incentives are being – to both the interest of the child, but also the incentives that are being created. And I guess what I wanted to ask is really not about the wrongful settlement, the well-settled issue, but really about the tolling issue in this case. Because the well-settled issue is simply a trump over the habitual residence at some point. But it really means that somebody who did something wrong, the mother is now, for the sake of the child, going to at least temporarily prevail. So the question is, what's the limits of that? And on the record in this case, why wouldn't the father be entitled to tolling for this period? As the district court said he was. Well, the district court suggested that that argument would have merit. If you actually look back at what the court – Is that all he did? He didn't decide it? He didn't decide it. It was in a footnote. But I'll take it on as even if he did, which we do in our brief, too, which is the Article 12 says specifically if it's determined the child's been wrongfully – But the district court did decide, and this seems critical for our decision, is that his testimony was credible. Because there was a dispute about whether the grandmother ever did say that she wasn't supposed to tell him where the child was, and the district judge does accept that. Okay. Then let's start with what Article 12 says, which is if it's been past a year and the child is well settled, you do not need to order a return. So the district court suggested maybe they would toll – I mean, it was four and a half years past the one-year deadline. No court's ever tolled all four and a half years. And just looking at – Well, first of all, a lot of that time is no fault of the Petitioner's, right? Because he files with the central authority, and then they take whatever time they take to file the petition. Is that how it works? That's actually not correct. Let's – if – we'll start with the Duarte test, which was the – No, but I want to know what the procedure is first. How does it work? How does it work for a Hague Convention? Yes. He went to Mexico and he filed a petition. When was the petition filed? The petition in the U.S. Court of Appeals. Another petition. When was his application filed? Well, that's exactly what I'm getting to. The child was wrongfully retained, as the district court found, in August or September of 2002. He had until August or September of 2003 to commence proceedings in the district court. He didn't even file – He didn't file the petition, right? Right. And he didn't even file his application. That's in Mexico to ask, you know, for the authorities in Mexico to help him locate the child. He waited until March of 2004. All right. Couldn't he have filed the petition without filing this application and going through the American central authorities and all that? Yeah. You can file straight in district court. You don't need to file the application. What the application is for is so that you can go to the central authority, who is charged with helping you to locate the child. That's the central authority. But he could file the petition and he don't know where the child is? Well, then he goes to the central authority if he wants to. No, no. I'm asking you, couldn't you go to court within a year, at the end of the year, and say, look, I don't know where this child is, but I'm filing a petition? If he had reason to believe she was in Orange County, which is where he knew her last address to be, in theory, he could have gone to Orange County court, filed the proceeding. There's provisions in the treaty for, you know, staying at if you – the notice provisions to be able to give notice to the respondent are in there on a different provision. So he could have gone into Orange County and said, here's where I think she is. I think she's in Orange County. That's where I know all her addresses have been. But the point is, and I think we're overlooking a little bit, which is that – So what is this Hague application under the Hague Convention on the civil aspects of international childhood protection? You don't have to file such a thing? It's not necessary? It's necessary if you want to invoke the resources of the central authority to help you locate the child and you want to go through the proceeding to have that assistance. They provide legal assistance, legal advice. They'll help you use – if you're in a different country and you want to be able to use the law enforcement mechanisms of another country to be able to help locate the child, you go through the central authority and you submit a Hague application. The petitioner never submitted his Hague application until 18 months after his daughter was wrongfully retained. He has one year to commence proceedings, and he waits 18 months before he even asks for – I didn't wait. He was actively doing stuff all that time. No, I'm sorry. Under – there was – under his own Hague petition, his pleading in the case says, child was wrongfully retained. I went to the Mexican central authority in August of 2003 and asked for information about how to fill out a Hague application. He didn't even ask for information on how to fill out a Hague application until 11 months after his daughter was wrongfully retained in the United States. They told him to come back with certain papers. He came back in October, two months later, with a set of papers. They then told him, you need these papers translated. If you look at his Hague petition, it's a less than 40-page document, 20 of those probably required translations. He didn't return until seven months later with his translation in March of 2004. And if you look at the Duarte test, you see that he said, you need evidence that the child was concealed and evidence that the concealment necessitated a long search for the child. He doesn't show that it was – I want to go back to that part. Judge Berzahn asked you whether the district court made a finding that the – about what the grandmother said. The finding the district court said was made was that she was not disclosed to disclose the new telephone numbers. Right. But actually, there's no finding that the grandmother was directed by Ms. Brito or whatever, by Ms. Brito, I guess we call her, that she was directed by Ms. Brito to tell her that she had moved or to conceal the address or the location of the child. There was no direction. There was no finding on that. And there was actually nobody ever moved, is the other point. The only finding was that she should not disclose the new telephone number. Right. The communication was cut off, that there was no concealment of the child. The child lived under her true name, attended public school. And again, there needs to be evidence that any kind of efforts to cut the Petitioner off required him to engage in a long search such that he was not able to commence proceedings within a year. And the important part is the reason why there is that one-year limit is because the drafters of the treaty said if you don't put a limit here and the child becomes settled, it is harmful to the child to remove her from the country where she has become settled. And that is exactly illustrated by Breonna's situation. She'll be taken out of school, taken away from her brother. It's a de facto deportation because she's being sent back to Mexico, and there just wasn't the evidence that the Petitioner acted expeditiously. If you look at the stipulated facts, those are found at Excerpts of Record 215. That's where he agrees. I didn't submit my Hague application until March 2004. And it's in his own Hague petition that he concedes that he waited 11 months before he went to go seek information only, and then another seven months just to get his documents translated. And up to that time, there was some delay. He called upon Brito to send the child back a number of times. And then I guess he agreed to allow her to stay in this country, provided he could talk to her and visit with her. Was that deal ever made? They did have that conversation, and we had argued that that was provided for another defense under the statute, which is acquiescence. The district court found that. Or being misled. The communication ended in 2002 or 2003. He certainly was as diligent as could be possible in pursuing this, was he not? I mean, he didn't want to give up his rights. Well, but the treaty specifically picks two dates for the one-year rule, which is, one, if you want to go through the treaty to get your child back, you have one year from the date of the wrongful retention to file a proceeding. Starting in August or September 2003, if he wanted his daughter back in the country, he had a ---- But when did he first realize there was a wrongful retention? The district court found that that date was August or September of 2003. And so he would have had from August or September or, I'm sorry, 2002, he would have had from August or September 2003 to bring a commensurate proceeding. And, in fact, for all he had, he was still in phone contact with her for six months. He was still aware at that time she would have been living in the Huntington Beach address because he was in phone contact. They weren't cut off from that until January of 2003. So for all that time, there was no reason why he couldn't have come in and commenced proceedings during those times. He waited for phone communication to be cut off. Then we don't know what he did, apparently. Tried to find her some other ways. Waited for another ---- for the 11 months to even go ask for information, the seven-month period where he was apparently translating less than 20, 20 pages of documents. And, you know, he introduced no evidence about ---- Now, let's find a way to look at it. Another way to look at it is this ---- I mean, this isn't a legal observation, but it's at least why these cases are so difficult. I mean, this man did spend an enormous amount of time. And energy in Mexico trying to prosecute this thing. I mean, driving 18 hours and sleeping outside. I mean, one credits him. The district court did. He put an enormous amount of effort into this. And he's, I gather, not a person of major resources. Well, first of all, as for the resources, there are plenty of provisions in the United States statutes implementing it and CFR regulations providing for free legal services, for assistance with ---- you know, that's the whole reason these organizations are set up are to assist parties. But putting that aside, as far as ---- Yes, but that's, as I observed at the beginning, they take their time about it. So ---- They're not supposed to. I mean, they're supposed to act expeditiously. Well, they're supposed to, but they, in fact, took three years. Well, I mean, I guess it gets to the second point, which is if we were inclined to look at equitable tolling, that's his burden. He needs to introduce evidence under the Duarte test that an inability to find Brianna caused the delay. Well, I mean, he did the intent. I mean, the footnote says a little more than we noted before. It says that he, it credits that he was told that Ms. Brito and Brianna no longer lived with the Huntington Beach ranchers. It doesn't say who told him, but that he was told that. And, moreover, his mother was visiting the other grandmother apparently relatively regularly and went and would ask where the kid was and wouldn't be told. So there was obviously an attempt to conceal this child. Well, I mean, let's keep in mind also that they all had the Huntington Beach address. There's no doubt. But he was told they left. I mean, that he wasn't there anymore. Right. But we don't know. Okay. So let's ---- we don't know what the search was. There was no evidence in terms of any search. Did they ever go to the Huntington Beach address? Sorry? I gather it was not very far away from where his mother was. In Orange County.  We asked the grandmother. Did anybody ever check there, check at the school? We asked every witness, did you ---- we don't know. That's the point. We asked ---- there was no evidence. And Ms. Brito never told them that she was no longer there. No. The only person that was testimony that told somebody that was a double hearsay statement from the grandmother, which she denied. But, again, exactly ---- And which there's no statement that the grandmother was told that by Ms. Brito to tell him that she had moved. Right. But nobody ---- nobody's testified that Ms. Brito claimed that she knew from anything. And no one ever made an effort to see whether the child was still where she had been for years and at the school where she had been. Nobody ever tried to check that? We asked both witnesses, did you ---- did either of you go to the Huntington Beach address to verify whether that was true or ask one of your relatives? How far away was his mother from the address or the school when she visited the other grandmother? Same county. Orange County. What ---- this is why I'm still trying to understand the system, because let's wash out for now, although I understand that there's a serious problem, with the period before he filed the application. But the purpose of filing the application is to get help in finding the child. He gave some very specific and relevant information, i.e., the grandmother's address and name and that phone number, right? I'm sorry? Did he put in the application the grandmother's phone number? He never put the last known address, which would have been Huntington Beach. I didn't ask for that. He put the grandmother's address. Okay. So presumably, if these people from the central authority were trying to find this child, they had a pretty good clue, i.e., the grandmother knew perfectly well where the child was. I mean, you ---- She wasn't telling the other grandmother, but I presume that that's what these people do. They go to relatives, known relatives at known places, and they try and find out where the child was. They had a pretty ---- assuming his story, that he was told that they were not at the Huntington Beach address, there wasn't a very good reason to go there, because they weren't there. So he gave them what he knew, which is where the grandmother was, and they, in three years, they weren't able to come up with the kid. Well, I mean, that you're ---- it's his burden to demonstrate the search that was done and all the other things. Well, that's what I'm asking you. Why is that? Why is it his burden to do a search when you have this system which is supposed to do the search, and he invoked it in an intelligent fashion? Oh, I'm sorry. It's not his burden to do the search at all. What I was getting at is his burden to demonstrate, using evidence, at the time of the proceeding, he had sophisticated counsel. There are provisions for discovery. We actually conducted discovery. He can go to those organizations and get discovery on what was done to find the child. He didn't do that. He introduced no evidence. So you're now saying it wasn't his burden to have it. So the fact that he didn't go to the Huntington Beach address and all that is really not wrong. The whole point of having this stuff, this system, is that it recognizes he's there in Mexico. How is he going to look for the kid? He told them the one piece of very relevant information, which is the grandmother who did know where the child was.  But we don't know whether authorities ever went. But why is that his problem? Because the treaty says if it's going to be beyond the treaty presumes if it's beyond a year and the child's now settled, it is harmful to her to remove her out of her environment. So the treaty tells you a defense. Kennedy, didn't she say the treaty does what? That if it's beyond a year and the child is now settled in the environment, you do not need to order her back. And the purpose of that treaty provision is to prevent harm to the child. And it balances the rights of the Petitioner against harm to the child and makes  Kagan. Kagan. I understand that. But what I'm trying to understand, I mean, these are horribly difficult cases. And what I'm trying to understand is you've been spending a lot of time focused on he could have done this and he couldn't have done that. But he did do what, as I understand it, the treaty provides for when you can't find a child, which is invoke central authority to go find the child. He did what the treaty says, but when he's trying to invoke the equitable tolling doctrine, which is his burden, he needs to introduce evidence of the fact that he couldn't find the child, required a long search. So he needs to show, like the Petitioners did in Ferns v. Reeves and the other Eleventh Circuit case, which is Lofts v. Lofts. They introduced ample evidence that there were searches done of the Respondent's home. They introduced evidence that the authorities went to schools and conducted searches of public databases. And then -- But whose fault is it if the authorities don't do it? I'm sorry? Whose fault is it if the authorities don't do it? If we knew that the authorities didn't do their job, that's a different question. What we're faced with is there was no evidence that he did. It's perfectly obvious. I mean, they knew the key thing. They knew where the grandmother was, right? But if it took them three years to find it and you're saying it was really easy, then they didn't do their job. We don't know. But the -- no, what I'm saying is we -- there was no evidence introduced of what job they did or didn't do. He didn't produce any files or any admissible declarations from anybody there. There was no evidence that he sought for, you know, couldn't get those kinds of declarations or documents. If you actually look at the International Child Abduction Remedies Act, which is a statute that implements the Hague Convention and instructs the agencies that do those sorts of things to keep records of their searches and to provide those records and give that information to Petitioners if they're requested, central authorities are also required to keep records. How was the child eventually found? In the record, all we have is a set of stipulated facts that just takes you through a simple timeline of when the Orange County district attorney's office was found. Scalia. I want to ask you a question of practical interest. Has the father been afforded any contact or visitation with his child during all this period of time? That wouldn't be in the record. I know that there were --. No, I know it's not in the record. I probably -- I know there was at least one court-ordered visit or agreed to by the parties during the proceeding. Couldn't the parties agree to some kind of regular contact and visitation and obviate all this problem? Certainly something the parties could discuss and have attempted to discuss. What is, which is what we did with the last Hague Convention case last month, but what the whole point of the Hague Convention is to get the child somewhere to have custody proceedings. Has there been any custody proceedings over this child? No, there have not been. So the argument is that if there were to be, they should be in the United States because that's where she's now settled. But if there aren't going to be, I mean, the whole premise is that you're not permanently returning the child. You're returning a child only long enough, as I understand it, to have custody proceedings. But neither parent in this case has instigated custody proceedings. As far as I know. I don't know what's been done in Mexico. If your client prevailed, whatever custody proceedings would be here. Right. And if your client loses, the custody proceedings would be in Mexico. Well, not only that. We would maintain the child would suffer the harm of being removed from an environment where she's been for the last six years. She's doing well. She's been educated. I mean, she's in sixth grade, had all her education in English up to this point. Nothing about any of the district court's findings suggests that she should be. Your Honor, I asked you about what arrangements have been made for visitation rights. One of the questions could be, if you were going to make some kind of arrangements, whether you could agree to custody proceedings to start quickly. I know there's an issue about which country. But there's certainly no reason custody proceedings couldn't commence in one country or the other. Well, I mean, that's outside the scope of what the Hagan mentioned. It's just about which country it is. And that's all that we'd be here to determine, whether that country is the United States or whether it's Mexico. And I assume you prefer the United States and your opponents prefer Mexico. Well, we prefer the United States. But it is something that could be resolved if you were to try to make some resolution of some of the issues. Right. And there could also be a private agreement between the parties. Yes. Again, it's outside the scope of the Hague issue. The Hague issue. Right. Okay. All right. Well, thank you. We'll hear from you at this time. It would be helpful if you began by telling us your version of how these proceedings were. Thank you. I think it's most helpful to start with a specific answer in this case. The district court did make a factual finding that in August or September of 2, the wrongful retention occurred. I'd help to suggest that there's a sort of vacuum that follows that until the application   Okay. The district court's factual findings really contain all of the information that's necessary to find and to uphold its suggestion, at least, that there was ample diligence. First, after that wrongful retention, the record's clear that Mr. Samarone made numerous, at least five requests that his daughter be returned for the school year. He enrolled her in school that fall and wanted her returned per the party's agreement in June when he sent her up there for the summer. That doesn't work out. He attempts to negotiate some sort of arrangement by which he can at least have access by phone or in person with his daughter, and that comes to a thudding halt in January of 2003 when Ms. Burrito changes her phone number. Has there been any contact since? Outside of the record, Your Honor. Between father and daughter? No in-person contact at all, except for the one court-ordered visitation of 30 minutes during the summer. The December evidentiary hearings. I could give you a ballpark as to the number of phone calls. Again, that's outside of the record, so I'm hesitant to do so, but there's been only the one in-person visit. But once the phone number is changed in January of 2003, that's when the necessitation for the search caused by the concealment really begins, and that begins with Mr. Samarone's mother traveling to the United States, as the court inquired about earlier, and going to one place where she knew she could find a point of contact, which was the Garden Grove address, and finding the one person that she knew she could reach and inquire about Brannett's location. And the record's clear that not only was Mr. Samarone and his mother told that the number had changed and that Ms. Brito and Brannett could not be reached there, but also that they were not at that location any longer. The district court's findings of fact at page 7 make that clear. Having been presented with this information... Page 7, or page 17. Page 7, excuse me. This is in the actual findings of fact section of the district court's order. Having been told that information and properly admitted for the effect on the listener by the district court, what were Mr. Samarone and his mother to do at that point? Ms. Samarone's mother travels to... Well, that's a question there may be some disagreement on. There certainly is a credibility issue. Yes, because he's told by Ms. Brito's mother that they were no longer at that address. Whether to accept that as a fact is maybe in dispute. Some people might not have simply accepted that, might have checked with the school, might have driven by the house. Others might not have. And that's part and parcel of the district court's role in this case, and really the trial court's role in every Hague Convention case, is to assess those sorts of credibility disputes. Well, did he say that you should accept that, that the grandmother says something, and therefore you don't need to look to see whether the child is still in school or still at the house because the grandmother says that? There's a number of things he could have done, Your Honor. Well, you asked the question, what did he do at that point? So I'm just giving you some answers. Sure. Absolutely right. What he did at that point is because he could not enter the country legally himself, he sends his mother. She inquires at Garden Grove and is told affirmatively that they're not at the Huntington Beach address. She then goes to the Mexican Embassy in Santa Ana looking for help, trying to find some sort of legal or administrative remedy, and is told that the only recourse is going to be through Acapulco, where Mr. Samarone is living personally. He then goes through an ordeal of one administrative agency to the next, starting in his home area of Acapulco, going to Family Integration Services, being referred from there to the Minor's Department of Protection, where he has to return four times before he's finally told that he needs to go to Mexico City, and from there he interacts with the State Department and is given very little information on how to fill out the application, and goes through that process, submits it, is forced to come back with translations to different occasions, all of which is merely in the factual record as evidence of the diligence that took place after the concealment. That's the search that was necessitated when Mr. Samarone realized that this was the only way he could do it. Is it ineffectiveness or incompetence of what the Mexican authorities are? I'm sorry, Your Honor. Why was it that he was forced to go through all of this from place to place? Was that the incompetence of the Mexican authorities? He was forced to do it because that's the only way he could do it. That's... Was he forced, and wherever these issues occur, it takes that long to do it, or you said he was told by one to go to the next place, to go to the other, and then he's forced to go to Mexico City? What I'm saying is that because of the ineffectiveness or incompetence of the Mexican authorities. It's fair to characterize it that way. I think that's not an inaccurate representation. Now, could he, in fact, on either, on the one-year anniversary of the original retention, or on the one-year anniversary, as you would put it, I think, of when he knew she was being concealed, simply have filed a petition in Orange County Court? He is authorized to do that. That's correct. He can file it there if he wants. What do courts do with that if you do that? Typically, my understanding is, and although that's not what happened here, my understanding is that that would necessitate a similar search to the one that took place in this case already. They still wouldn't know where she was. And does the Hague Convention one-year rule clearly turn on the petition as opposed to the application or anything else? It is the petition. But the purpose of the equitable tolling doctrine, taking that into account, is really focusing on the fact of concealment and the evidence of diligence. And there's no question that both of those occur here, and both turn on. Do you know of any case in which the child remained where she was without being moved and that was, that constituted the concealment? Not where there, not without the active measures to conceal the child that took place in this case, Your Honor. And you do know of a case where the child remained where she was without being moved? No, Your Honor. No. I do not. But what the decision Do we know anything about what did happen after he filed the application? Do we know how they found the child eventually? Do we know why it took three years? Do we know anything about that? We do not, Your Honor. That's not in the record. And counsel is correct that the stipulated set of facts does explain the chronology of how the application was transmitted from Mexico to the United States Authority, from there to the National Center for Missing and Endangered Children, from there to the California Attorney General, and from there to the Orange County District Attorney. But none of those people, I mean, either all of these entities just didn't do anything, or it wasn't easy to find her, one or the other. That's correct. They just sat there, because as it turned out, if they started to investigate, they could have gone to the grandmother, asked the grandmother where the daughter was living, and they would have been, if they had, do they have any subpoena authority or authority to compel testimony at all? I'm not familiar with that, Your Honor. No, no. I mean, what Mr. Samarone was doing from Mexico, a thousand miles south of the border, was relying on the duty and the burden that the head convention places on the central authorities, and the burden of cooperation between the signatory countries to do all that they can to locate the child. And when Mr. Samarone filled out his application, he was instructed to provide the last known address. He told them what he knew about Ms. Brito and Brandon no longer being at the Huntington Beach address, and was instructed by the Mexican State Department to list the Garden Grove address. That was the next most likely address, and the case law supports providing friends, relatives, next known addresses. And where somebody was that definitely knew where the kid was, plainly knew where the kid was. And that's exactly why Grandmother Samarone went there first in 2003 when she was searching for her. Let me ask you one question. The only issue about tolling is whether the court can decide this on the merits rather than automatically returning the child to Mexico. If you find equitable tolling, the child automatically goes back to Mexico? That's correct. And if you don't find tolling, then the court decides on the merits what's best for the child? No. No. The order of operations would be, and because at the outset, the issue of wrongful retention and habitual residence is not on appeal, that's decided. So the prima facie case is in place. Right. So where did the court decide if there were no tolling? If there were no tolling, the court would still have to decide whether the district court clearly erred in its factual findings as to well-settled status and its ultimate conclusion that Branham was not well-settled. But at the end of it all, all you have is an order that the kid stays here. And after that, if anybody's going to do anything, there's a separate set of proceedings where somebody has to go to a family court in either California or Mexico and file a custody proceeding, right? That's correct. But all the Hague proceedings end with the determination the child stays here, period. Absolutely right. Is that right? That's right. And the courts have repeatedly, and the Hague Convention itself emphasizes, the limited role of this remedy. It's to respect the reciprocity of the signatory countries and the country of habitual residence's interest in deciding the custody dispute of these three Mexican citizens. That's the purpose. Well, if the court here was deciding whether the child is well-settled, in that issue you go into whether the child, how long it's going to be here, whether it's subject to being removed by immigration. You look at the testimony of whether the child can testify as to how happy she is here. All of those things will relate to whether the child is well-settled or not. The child's testimony actually relates to a different defense. That's an Article 13 defense that's also not on the case. What's the ultimate relief your client seeks? Would he be content with visitation, having the child with him in Mexico on school vacations, different kinds of contact? I mean, what's the bottom line to avoid all the difficulty? Not to be too oblique, Your Honor, but it's certainty. The answer is certainty. Certainty that he will have access, that he can see her, that he can restore his relationship that's been cut off for six years. But that would require, I mean, he could file custody proceedings here tomorrow, or he could file custody proceedings in Mexico and try and get those determinations made, right? Correct. And he could file, I mean, even while this case is pending, he could have filed the custody proceedings here. I mean, I guess the custody proceedings have to be filed where the kid is. Is that right? Where the child is. It's a the under the Hagen mentioned the proceedings have to be filed in the country of habitual residence. The custody proceedings, the ultimate custody proceedings, not this. Correct. Are traditional, I guess it's a question of the local law, but ordinarily it's where the child is. I can't answer as to typical family law. Is that what he seeks, permanent custody? In Camden, Your Honor, I have not had that conversation on the merits with my client simply because that's not the inquiry under the Hagen mention. I mean, it does strike me that a lot of the kinds of considerations, including immigration status, are somewhat more appropriately taken into account in the custody proceedings. You never have addressed at all what you think the pertinence of the immigration status is to the well-settled area. Certainly, it behaves, Your Honor, and the short answer is that it is pertinent. And the district court assigned appropriate weight to it, was within its discretion to assign. Almost supervening weight, because in every other respect, this child was well-settled, no? Well, the evidence, so looking closely at the language of the district court's order, it does say, after considering all the evidence presented relevant to the well-settled status. Yeah, but what other factors were there that cut in the other direction? None. The concealment. The fact of concealment is one. Courts have taken into account. That doesn't have to do with whether she's well-settled. It does indeed. Why? It does indeed. The courts have considered the very fact that concealment and cutting off the relationship with the left-behind parent is itself undermining the well-settled status of the child. That undermines that child's relationship with a parent that they once had a strong bond with. They're well-settled where they are. The question, though, is whether they're well-settled generally. And the courts have made clear that that fact of concealment undermines that finding. Also, there simply wasn't sufficient evidence in the record as to Ms. Brito's stable employment history, another fact that the district court referred to in its factual findings, and that supports its finding that Brenda was not well-settled. But the suggestion that the ---- What does well-settled mean? Well-settled in the country? Well-settled in a particular location? The Hague Convention is not precise in its definition, nor is the State Department of the courts. Also, does it have a quality component? Does it mean well-settled, like the child is well? The question is really not whether they're happy or have a comfortable material existence. Those are all more properly addressed in the custody proceedings themselves, the underlying custody proceedings. But you suggested when you said the concealment was pertinent, you were really saying, you know, it wasn't good for the kid to be concealed, so she wasn't well. It seems to me that's what you were saying. The courts have described it that way. And they've assessed the measures taken to conceal the child as fundamentally undermining the well-settled status. But it's important not to tread too closely to the line of the merits of the custody proceedings. That's the whole purpose of the Hague Convention, is to ensure that signatory countries' rights to decide. But that's why it does seem rather far-fetched to me to take immigration status alone, without any indication that there's really any proceedings or deportations in the works, as relevant. Because as was observed, I mean, this is by design supposed to be focused on now, because what's supposed to happen next is there's supposed to be permanent custody proceedings. So why do we care that maybe in five years somebody might try and deport her? Well, the question of whether Brianna is settled now is fundamentally affected by uncertainty and the uncertainty that's created by her undocumented status. Can I ask something in relation to that? I mean, this is just prudentially. If we decide this case or write an opinion and we put her name in, and her mother's name in, and the fact that they live in Huntington Beach, is that going to get them deported? I don't know, Your Honor. Ms. Brio's counsel may be better prepared to answer that question. But returning to the, really, the purpose of the well-settled finding, one thing that hasn't been discussed yet today is putting that discreet affirmative defense in the context of the hate convention itself, which posits as its fundamental principle discouraging international child abductions by removing the advantages that would otherwise be gained. The hate convention sets out Article 12 as a narrowly construed... You know, that's kind of a good argument for, well, not having a well-settled rule, but there is such a rule. I mean, the whole well-settled rule obviously cuts, is somewhat cuts against the entire hate convention theory by, by looking at the child's welfare instead of the incentives for removal. Only if you presume that the hate convention places those two purposes in equipoise, which it clearly doesn't. It sets out Article 12 in the language the article says, says the child shall be returned unless this is set out, at which point the district court retains discretion to return the child nonetheless under Article 12 and under Article 18. The way the framers, the drafters composed Article 12 within the context of the overall convention demonstrates that it is not a co-equal purpose. So the well-settled is not the end of it. It is not. Yeah. That's what I thought when I said that it wasn't the end. Then the judge can decide it on the merits, whether to return it or not. No. It wouldn't be a decision on the merits, Your Honor. On what grounds can he return it if she's well settled? The language of Article 18 is that the court, the trial court can exercise its discretion to return the child, notwithstanding the existence of an affirmative offense, if the purposes of the convention would be served thereby. Okay. Well, I don't know what that means, but I said merits. I should have said if the court and its discretion feels like doing it. Sticking to the language of the convention, Your Honor. If it would effectuate the purposes of the Hague Convention. More. Which are, as you say, to prevent international child abduction. Precisely. Precisely. So, in other words, he can do it if he feels like it. Well, the way the court says he's well settled. So any discretionary standard necessarily involves discretion, Your Honor. What Article 18. Now I think we're in agreement. What Article 18 attempts to do is provide the trial court an opportunity to really evaluate the entire record, notwithstanding the existence of an Article 12 offense, which, in fact, was not established in this case. Well, I think that's where I was about a half hour ago in our 10-minute discussion or 20 minutes, that once he decides that she's well settled, he then can get on and all the factors and decide what's best. He can decide. In his discretion. In his discretion, how he can best effectuate the treaty. Correct. Okay. Correct. So the way the real, from this Court's perspective, this would work, is that it may affirm on either tolling, equitable tolling, based on the factual findings of the record, or on the well settled defense finding by the district court. If the court decided that he was wrong. Within his discretion. By that, we have to send it back to exercise discretion. The facts are on the record for him to do so. But if the court elected to. If we thought that you were wrong, that it was well settled, and that he was, and that the equitable tolling was not a problem, then it would go back to him and he would exercise his discretion under the treaty as to whether the child should have a custody fight here or in Mexico. That's the question the district court would answer at that point. In his discretion. In the purpose, to serve the purposes of the treaty. Effectuate the purposes of the treaty. Correct. Okay. Thank you. Thank you, Your Honor. I went over on rebuttal. But I just want to point out that the district court didn't exercise its discretion under Article 18. It actually found Article 12. No, no. We agreed that it would, if you prevailed on the well settled point, and you prevailed on the equitable tolling point, then it would go back to the district court to exercise its discretion if it chose to. Right. But I'll go back to, I would think that that would even be, I mean, the record's closed on all the facts. I think even that would be an abuse of discretion given that she just falls squarely within Article 12, which is, and again, the purpose of Article 12 is preventing harm to the child. There's nothing here about why it wouldn't be harmful to Brianna to take her out of school, to take her away from her brother who lives here, and to send her back to here again. Are you saying that if a child is well settled, that the court does not have discretion? Under these facts and the record that we have, the child being here for almost six years, and proceedings not being commenced, I would say we're outside what the drafters of the treaty ever intended. I mean, they intended that these proceedings be commenced within one year. Beyond one year, they thought it would be harmful. We're over five years now. We're so far away from what the intent of restoring the child back to the original  What does the treaty say about when it can exercise its discretion? I think it does. I think the Petitioner's attorney is correct. It doesn't really give a lot of guidelines. But in the Perez-Vera report, which is the Moses decision called that, the sort of Bible of the Hague Convention that gives you all the background, when they discuss the well-being of the child. I'm not talking about whether it might be an abuse of discretion or not. I'm saying, what under the treaty, if the court found that a child was well settled, an ex-child, any child was well settled, and that there was no equitable tolerance, it was beyond a year. In abstract theory, what happens next? Does the court then have discretion? I'd imagine that the court in certain circumstances would, if it was, let's say, 14 months instead of, you know, two months after the 12-month deadline. What does it say in the treaty? What does Article 18 say? The provisions of this chapter do not limit the power of a judicial or administrative authority to order the return of a child at any time. I don't know what that means. It doesn't really say discretion. I mean, that would seem to say the provisions of the chapter don't require that you follow the chapter. So I don't know what it means. So whatever happens, if we return this case, the court might or might not think Article 18 applied. And if he did think it, you would say it would be an abuse of his discretion.  And in the Moses decision they said you don't necessarily have to remand if the record's closed and it's clear on the record what the proper outcome would be. I mean, you could remand as well, but it wouldn't necessarily happen. If it was going to be another round of abuse. Kagan. You have to answer to my question about are we simply inviting deportation if we start making this case public? I mean, this hasn't been filed under seal or anything, but is there a problem? If her name is used in any sort of decision? No, because as the Supreme Court has pointed out in Plyer v. Doe, deportation is a discretionary function of the federal government. They can choose not to. The person's question is wouldn't you be better off if this case, assuming it came out against you, wouldn't it be better to put Doe in instead of the name? Well, if it's decided against her, she'll be deported anyway, essentially. Yeah, we'd be happy with that, sort of not using the child's name. Well, if it came out against you, the mother might not want to move to Mexico. When she'd be separate and then the child would lose, again, the child's harmed again because now she's losing her relationship with her brother who's a U.S. citizen. No, no, that's not what we're talking about. We're not talking about how it should be decided on the merits. Suppose you ran into three really dumb judges who decided this against you. I can't imagine that. And, you know, we're quite used to separating children from their mothers. We do that all the time in immigration cases, and their fathers, and wives from husbands. And, you know, that's the immigration system in this country. But this is not an immigration proceeding. I know, but I'm just saying what you say is such a horrible consequence. It's something we're used to doing all the time because we have immigration cases. Right. So maybe we're hardened by our country's policy, but it's not something so unusual. But the only question that Bruce, I was asking you, is wouldn't everybody be better off if you didn't have your names in a published opinion? I'd be speculating on how the immigration enforcement works. My understanding is that the target. All right, you want your names in front. My client hasn't expressed any objection to that. But if the Court, with more knowledge on how the immigration system works, would want to keep that out, that's more than fine with us. Okay. Do you have anything else? Your time is way over, but if you get to know it. Well, I just wanted to address quickly on the equitable tolling, the notion that if there was any sort of issues with the Mexican bureaucracy being, giving him the runaround, and that would entitle him to tolling. That creates, that can't be the rule. It's not the rule stated in Duarte that if there's some sort of bureaucratic issue, that all the time should be tolled, because that would create the incentive of all the central authorities that they don't need to act quickly. And it, again, it doesn't achieve the purpose of Article 12, which is to prevent tolling. I mean, I understand you have a problem with the period until he filed the application. But once he filed the application, and did what he was supposed to do, and the whole system is set up for him to have somebody help him find the child, I don't understand how that could be ascribed to him. Well, then I would require the defendant, or I'm sorry, the Petitioner in that case to introduce evidence that there was an incompetent search that was done, there was no search that was done, or the search should have been better, and that it couldn't have been better because of concealment. If he doesn't introduce any evidence of any search, why is he entitled to a presumption that a bad search was done? There's just no evidence either way on the search. I don't even know for sure. What Article 12 says is that at the date of the commencement of the proceedings before the judicial or administrative authority of the contracting State, and it's not possible that the plumbing of this application was the commencement of proceedings before an administrative authority? That question is squarely answered in, if you look at the 42 U.S.C. 110603B, which is the U.S. statute that implements the Hague Petition. Right. That says, Seeking to initiate judicial proceedings requires commencing means commencing a civil action by filing a petition. It says judicial or administrative. Right. But that has already been defined in previous case law, and I think it's stipulated by the other side, that that means filing a petition in a court of appropriate jurisdiction. That means filing a petition in Orange County. So that's what he -- We had another half hour, I would ask you. We've explored the inefficiencies and ineffectiveness of the Mexican administrative system. I would ask you how long it might take if these proceedings were conducted in the Mexican judicial system, whether you had any idea how efficient that is and how long they might take. But we don't have a half hour, so I won't ask you that question. I won't answer it then. Thank you, Your Honor. Thank you, counsel. I know what? One brief administrative matter. Our administrative? You're not going to talk about how efficient we are. It may or it may not. It may or it may not. And I raise this gingerly. We received some information this morning that, in respect to counsel, is not an opportunity to investigate or confirm it that may be significant, that may affect the party's willingness to discuss a resolution to this case. And I raise it for the court only out of a duty of candor and ask that the court provide us a matter of days or a week to confirm the information and if there's  Would it be useful if, in doing that, we also you also try talking to our mediators a little bit along the way? We would consider that, yes, Your Honor. Yes? We'd be open to that, yes. You would be what? Open. That's all. So we won't do anything for the next few weeks? We'll be in touch as soon as we can possibly. All right. I can assure you you don't have to worry, despite our efficiency, that we will have an opinion. But the real question is would it be better if we vacated the submission now and made the mediators available now while you consider whatever this information is? My immediate sense is not yet, Your Honor. I don't speak for those of counsel. Well, we won't submit it. And you'll let us know when you might be willing to participate in mediation or if you'd be willing. We'll just wait to hear from you further. Win and death. Thank you. Thank you, Your Honor. The case, it's argued, will not be submitted. And the Court will stand in recess until tomorrow. I'm our case. Oh, no. Every day. He's just getting anxious.
judges: Reinhardt, Berzon, Miner